GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
By: HAGAN SCOTTEN
Assistant United States Attorney
One Saint Andrew's Plaza
New York, New York 10007
Tel. (212) 637-2410

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| -v.- | : | **VERIFIED COMPLAINT FOR FORFEITURE** |
| $1,000,000 IN UNITED STATES CURRENCY, | : | 18 Civ. |
| Defendant-*in-rem*. | : | |

Plaintiff United States of America, by its attorney Geoffrey S. Berman, United States Attorney for the Southern District of New York, for its verified complaint, alleges, upon information and belief, as follows:

## I. JURISDICTION AND VENUE

1. This action is brought pursuant to Title 18, United States Code, Section 981 by the United States of America seeking the forfeiture of $1,000,000 in United States currency (the "Defendant Funds" or the "Defendant-*in-rem*").

2. This Court has jurisdiction pursuant to Title 28, United States Code, Section 1355.

3. Venue is proper under Title 28, United States Code, Section 1355(b)(1)(A) because certain actions and omissions giving rise to forfeiture took place in the Southern District of New York and pursuant to Title 28, United States Code, Section 1395 because the Defendant Funds have been transferred to the Southern District of New York.

4. The Defendant Funds constitute property involved in money laundering and proceeds of wire fraud, and are thus subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A) and (a)(1)(C).

5. Upon entry of a final order forfeiting the Defendant Funds to the United States, the Government intends to recommend that the Defendant Funds be distributed to victims of the payday lending scheme perpetrated by Scott Tucker ("Tucker"), consistent with the applicable Department of Justice regulations, through the ongoing remission process. *See* 18 U.S.C. § 981(e)(6) and 28 C.F.R. Part 9.

## II. BACKGROUND

6. From in or about the late 1990s through in or about 2013, through various companies that he owned and controlled (the "Tucker Payday Lenders"), Tucker extended short-term, high-interest, unsecured loans, commonly referred to as "payday loans," to individuals in New York and around the country at interest rates as high as 700 percent or more and in violation of the usury laws of numerous states, including New York.

7. In order to induce customers to obtain the loans and to make payments on the loans exceeding the amounts allowed by law and the amounts which the customers were told they were required to pay, Tucker made material misrepresentations concerning the true cost of the payday loans offered by the Tucker Payday Lenders and the identity of the lender offering the loans.

8. Tucker sought to evade applicable laws by entering into a series of sham relationships with certain Native American tribes (the "Tribes"), including the Santee Sioux Tribe of Nebraska (the "Santee Sioux"), in which he assigned nominal ownership of his payday lending companies to certain corporations created under the laws of the Tribes in order to

conceal his ownership and control of the Tucker Payday Lenders and gain the protection of tribal sovereign immunity—a legal doctrine that generally prevents states from enforcing their laws against Native American tribes.

9. From in or about 2005 until at least in or about 2013, representatives of the Santee Sioux entered into business agreements concerning payday lending with Tucker and various entities controlled by Tucker. Under these agreements, Tucker and entities controlled by Tucker, and not the Santee Sioux, provided the capital to make loans, and the Santee Sioux and its entities were not responsible for any losses. Neither the Santee Sioux, nor any entity that it controlled, established or paid to acquire any part of Tucker's payday lending business. Tucker and others based in Overland Park, Kansas, and not the Santee Sioux, managed operations and created the loan approval criteria. All essential steps necessary for the approval of loans were performed in Overland Park, under the direction of Tucker and individuals ultimately reporting to Tucker. Tucker, and others reporting to Tucker, controlled the collection of interest and principal on the loans and the profits earned from the lending activity.

10. Tucker, and others reporting to Tucker, using powers of attorney, opened or caused to be opened certain bank accounts in the name of an entity controlled by the Santee Sioux. Neither the Santee Sioux nor any entity that it controlled exercised control over these accounts.

11. In return for making monthly payments to the Santee Sioux, Tucker used his agreements with the Santee Sioux to evade state usury laws by claiming that the tribe's sovereign immunity applied to portions of his payday lending business.

12. In state court litigation concerning Tucker's payday lending business, representatives of the Santee Sioux, who were also officers of the entity controlled by the Santee

Sioux that was involved in the loan business, submitted affidavits. These affidavits were false, in part, because they overstated the involvement of the representatives and the Santee Sioux and the entity controlled by the Santee Sioux in the operations of the loan business.

13. On October 13, 2017, Tucker and his attorney, Timothy Muir, were convicted, following a jury trial, in the United District Court for the Southern District of New York of, among other things, wire fraud and money laundering, in violation of Title 18, United States Code, Sections 1343 and 1956, for their roles in perpetrating the massive payday lending scheme.

## III. THE DEFENDANT-IN-REM

14. On or about April 25, 2018, the entity controlled by the Santee Sioux that was involved in the loan business (the "Entity") entered into a Non-Prosecution Agreement (the "NPA") with the United States with respect to its conduct relating to the payday lending scheme. Under the NPA, the Entity agreed to forfeit $1,000,000 in United States currency to the Government representing the proceeds of and money involved in the payday lending scheme described above. Pursuant to the NPA, the Entity transferred the Defendant Funds to the United States in the Southern District of New York as a substitute *res* for the proceeds of and money involved in the scheme. The Entity agreed that the Defendant Funds are subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C).

15. The NPA and the accompanying Statement of Facts are attached hereto as Exhibit 1.

## IV. CLAIM FOR FORFEITURE

16. Incorporated herein are the allegations contained in paragraphs one through fifteen of this Verified Complaint.

17. Title 18, United States Code, Section 981(a)(1)(C) subjects to forfeiture "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specific unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."

18. "Specified unlawful activity" is defined in Title 18, United States Code, Section 1956(c)(7), and the term includes, among other things, any offense listed under Title 18, United States Code, Section 1961(1). Section 1961(1) lists, among other things, wire fraud (Section 1343).

19. Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

20. By reason of the foregoing, the Defendant Funds are subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(A) and (a)(1)(C), because the Defendant Funds constitute proceeds of wire fraud, in violation of Title 18, United States Code, Section 1343, and property involved in money laundering, in violation of Title 18, United States Code, Section 1956.

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant-*in-rem* and that all persons having an interest in the Defendant-*in-rem* be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant-*in-rem* to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
June 26, 2018

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
Attorney for the Plaintiff
United States of America

By: ______________________
HAGAN SCOTTEN
Assistant United States Attorney
One St. Andrew's Plaza
New York, New York 10007
Telephone: (212) 637-2410

**VERIFICATION**

STATE OF NEW YORK )
COUNTY OF NEW YORK :
SOUTHERN DISTRICT OF NEW YORK )

RANDALL D. PRAISWATER, being duly sworn, deposes and says that he is a Special Agent with the Internal Revenue Service – Criminal Investigations ("IRS-CI"), and as such has responsibility for the within action; that he has read the foregoing complaint and knows the contents thereof, and that the same is true to the best of his knowledge, information, and belief.

The sources of deponent's information on the ground of his belief are official records and files of the United States, information obtained directly by the deponent, and information obtained by other law enforcement officials, during an investigation of alleged violations of Titles 18 and 31, United States Code.

RANDALL D. PRAISWATER
Special Agent
Internal Revenue Service --
Criminal Investigations

Sworn to before me this
5 day of June 2018

NOTARY PUBLIC

SANDIE KISTLER
Notary Public - State of Kansas
My Appt. Expires 2/15/21



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 13, 2018

<u>By Electronic Mail</u>
James Nesland, Esq.
jenesland@comcast.net

**Re: Non-Prosecution Agreement with Santee Financial Services**

Dear Mr. Nesland:

On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will not criminally prosecute Santee Financial Services, Inc. ("SFS"), a corporation established by the Santee Sioux Tribe of Nebraska, for any offenses (except for criminal tax violations as to which this Office cannot and does not make any agreement), including violations of 18 U.S.C. § 1961 et seq., 18 U.S.C. § 1343, and 18 U.S.C. § 1956, related to SFS's involvement in the payday lending business with Scott Tucker ("Tucker") and various companies controlled by Tucker, from in or about 2005 to in or about 2013, to the extent SFS has disclosed such involvement to this Office as of the date of this Agreement.

Moreover, if SFS fully complies with the understandings specified in this Agreement, no testimony or other information given by SFS or its representatives (or any other information directly or indirectly derived therefrom) will be used against SFS in any criminal tax prosecution. This Agreement does not provide any protection against prosecution for any crimes except as set forth above. Pursuant to resolutions of the Boards of Directors of SFS, duly authorized representatives are authorized to enter this Agreement on behalf of SFS and bind SFS to the obligations set forth herein.

SFS has previously admitted, and hereby SFS acknowledges, affirms and accepts as accurate the Statement of Facts, attached hereto as Exhibit A, which is incorporated by reference herein.

It is understood that SFS shall (a) truthfully and completely disclose all information with respect to the activities of itself and its officers, agents, and employees concerning all matters about which this Office inquires of it, which information can be used for any purpose; (b) cooperate fully with this Office, the Federal Bureau of Investigation ("FBI"), the Internal Revenue Service ("IRS"), the United States Attorney's Office for the District of Kansas ("USAO D-KS"), the Federal Trade Commission ("FTC"), and any other law enforcement agency designated by this Office; (c) attend all meetings at which this Office requests its presence, and use its reasonable best efforts to secure the attendance and truthful statements or testimony of any past or current officers, or employees of SFS at any meeting or interview or before the grand jury or at trial or at any other court proceeding; (d) provide to this

Office upon request, any document, record, or other tangible evidence relating to matters about which this Office or any designated law enforcement agency inquires of it; (e) bring to this Office's attention all criminal conduct by or criminal investigations of SFS or any of SFS's agents or employees acting within the scope of their employment related to violations of federal laws of the United States, as to which SFS's Board of Directors and/or senior management and/or legal counsel are aware; (f) bring to this Office's attention any administrative or regulatory proceeding, or civil action or investigation in which SFS has been or are a subject, target, party, or witness; and (g) commit no crimes whatsoever subsequent to the execution of this Agreement. Nothing in this Agreement shall be construed to require SFS to provide any information, documents, or testimony protected by the attorney-client privilege, work product doctrine, or any other applicable privilege. Any assistance SFS may provide to federal criminal investigators shall be pursuant to the specific instructions and control of this Office and designated investigators. SFS's obligations under this paragraph shall continue until the later of: (1) a period of one year from the date that this Agreement is executed; or (2) the date on which all prosecutions arising out of the conduct described in the opening paragraph of this Agreement are final.

As a result of the conduct described in this Agreement and in the attached Statement of Facts, SFS agree, pursuant to Title 18, United States Code, Section 981(a)(1), to forfeit to the United States $1,000,000 (the "Forfeiture Amount"). SFS agrees that the Forfeiture Amount represents a substitute *res* for proceeds of and money involved in the offenses described above in connection with the conduct described in the Statement of Facts. SFS further agrees that the Forfeiture Amount is subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C). SFS further agrees that this Agreement and the Statement of Facts may be attached and incorporated into a civil forfeiture complaint (the "Civil Forfeiture Complaint") that will be filed against the Forfeiture Amount. By this agreement, SFS expressly waives any challenge to that Civil Forfeiture Complaint and consent to the forfeiture of the Forfeiture Amount to the United States. SFS agrees that they will not file a claim with the Court or otherwise contest the civil forfeiture of the Forfeiture Amount and will not assist a third party in asserting any claim to the Forfeiture Amount. SFS also waives all rights to service or notice of the Civil Forfeiture Complaint, and agree to entry of a Final Order of Forfeiture against the Forfeiture Amount. SFS shall transfer the Forfeiture Amount to the United States no later than May 30, 2018 (or as otherwise directed by the Office following such date). Such payment shall be made by wire transfer to the United States Treasury, pursuant to wire instructions provided by the Office. SFS certifies that the funds used to pay the Forfeiture Amount are not the subject of any lien, security agreement, or other encumbrance. Transferring encumbered funds or failing to pass clean title to these funds in any way will be considered a breach of this Agreement.

It is understood that, should it be determined that: (a) SFS committed any crimes during the term of this Agreement; (b) SFS or any of its representatives have intentionally given false, incomplete, or misleading testimony or intentionally provided false, incomplete or misleading information to the Office; (c) the misconduct extended beyond its involvement in the payday lending business described above; or (d) SFS has otherwise violated any provision of this Agreement, then: (i) SFS shall thereafter be subject to prosecution for any federal offense of which this Office has knowledge, including perjury and obstruction of justice; (ii) all statements

made by SFS's representatives to this Office or other designated law enforcement agents, and any testimony given by SFS's representatives before a grand jury or other tribunal whether prior to or subsequent to the signing of this Agreement, and any leads therefrom, shall be admissible in evidence in any criminal proceeding brought against SFS and relied upon as evidence to support any penalty imposed on SFS; and (iii) SFS shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule that such statements or any leads therefrom should be suppressed. In addition, any such prosecution that is not time-barred by the applicable statute of limitations on the date of the execution of this Agreement may be commenced against SFS, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date when this Agreement is signed.

It is understood that this Agreement is binding on this Office but does not bind any other Federal agencies, any state or local law enforcement agencies, any licensing authorities, or any regulatory authorities. This Office will, however, bring the cooperation of SFS to the attention of other prosecuting offices, if requested by SFS or by its attorneys.

The parties understand that this Agreement reflects the unique facts of this case and is not intended as precedent for other cases.

It is understood that this Agreement is a public document and may be provided to any person by this Office and SFS.

This Agreement supersedes all prior understandings, promises and/or conditions between this Office and SFS. No additional promises, agreements, and conditions have been entered into

other than those set forth in this Agreement and none will be entered into unless in writing and signed by both parties.

Very truly yours,

GEOFFREY S. BERMAN
United States Attorney

By: ______________________
Hagan Scotten / Sagar K. Ravi / Niketh Velamoor /
Assistant United States Attorneys
(212) 637-2410 / -2195 / -1076

APPROVED:

Joan Loughnane
______________________
Joan Loughnane
Acting Chief, Criminal Division

AGREED AND CONSENTED TO BY ~~RCS~~ SFS:

______________________ 5-4-18
Lee Ickes
President, SFS

Date

APPROVED:

______________________ 5/4/18
James Nesland, Esq.
Attorney for SFS

Date

**Exhibit A: Santee Sioux Statement of Facts**

1. From in or about 2005 until at least in or about 2013, representatives of the Santee Sioux Tribe of Nebraska ("the Santee Sioux") entered business agreements concerning payday lending with Scott Tucker ("Tucker") and various entities controlled by Tucker. Under these agreements, Tucker and entities controlled by Tucker, and not the Santee Sioux, provided the capital to make loans, and the Santee Sioux and its entities were not responsible for any losses. Neither the Santee Sioux, nor any entity that it controlled, established or paid to acquire any part of Tucker's payday lending business. Tucker and others based in Overland Park, Kansas, and not the Santee Sioux, managed operations and created the loan approval criteria. All essential steps necessary for the approval of loans were performed in Overland Park, under the direction of Tucker and individuals ultimately reporting to Tucker. Tucker, and others reporting to Tucker, controlled the collection of interest and principal on the loans and the profits earned from the lending activity.

2. Tucker, and others reporting to Tucker, using powers of attorney, opened or caused to be opened certain bank accounts in the names of an entity controlled by the Santee Sioux. Neither the Santee Sioux nor any entity that it controlled exercised control over these accounts.

3. In return for making monthly payments to the Santee Sioux, Tucker used his agreements with the Santee Sioux to evade state usury laws by claiming that the Tribe's sovereign immunity applied to portions of his payday lending business.

4. In state court litigation concerning Tucker's payday lending business, representatives of the Santee Sioux, who were also officers of the entity controlled by the Santee Sioux that was involved in the loan business, submitted affidavits. These affidavits were false, in part, because they overstated the involvement of the representatives and the Santee Sioux and the entity controlled by the Santee Sioux in the operations of the loan business.